**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 7 |
| EIGHT-115 ASSOCIATES, LLC | : | |
| | : | Case No. 20-11812 (MG) |
| Debtor. | : | |

--------------------------------------------------------x

## STIPULATION AND ORDER, PURSUANT TO BANKRUPTCY RULE 9019 AND SECTIONS 105, 362, 363, 364, AND 502 OF THE BANKRUPTCY CODE, (I) SETTLING AND ALLOWING THE CLAIMS OF HARLEM MULTIFAMILY LLC; (II) DETERMINING HARLEM MULTIFAMILY LLC HAS FIRST PRIORITY LIENS ON THE DEBTOR'S PROPERTY; (III) DIRECTING THE SALE OF THE DEBTOR'S REAL PROPERTY; AND (IV) GRANTING RELATED RELIEF

This stipulation and order (the "**Stipulation**") is entered into by and between (i) Yann Geron (the "**Trustee**"), as chapter 7 trustee of the estate of Eight-115 Associates, LLC, successor by conversion to Eight-115 Associates, L.P., the above-captioned debtor (the "**Debtor**"), and (ii) Harlem Multifamily LLC (the "**Lender**"). The Trustee and the Lender are sometimes collectively referred to herein as the "**Parties**" and are sometimes each individually referred to as a "**Party**".

## RECITALS

I.     **The Debtor's Ownership and Management**

A.     The Debtor is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business located at c/o Reifer Management, 307 West 117 Street, New York, New York 10027.

B.     The sole member and sole manager of the Debtor is Lincoln 95 Associates, L.P. ("**Lincoln 95**").

C.     Stanley Reifer is the sole general partner of Lincoln 95.

D.     Daniel Reifer is Stanley Reifer's son.

E.      Upon information and belief, (i) DRR Irrevocable Trust (the "**DRR Trust**") is a New York trust and Daniel Reifer is a co-trustee and sole beneficiary of the DRR Trust, and (ii) DRR Trust is a limited partner of Lincoln 95 and owns an approximate 89% limited partnership interest in Lincoln 95.

F.      Upon information and belief, (i) Daniel Reifer owns an approximate 5% limited partnership interest in Lincoln 95, (ii) Daniel Reifer's brother, Jeremy Reifer, owns an approximate 4% limited partnership interest in Lincoln 95, and (iii) other than Stanley Reifer, the DRR Trust, Daniel Reifer and Jeremy Reifer, there are no other general or limited partners of Lincoln 95.

## II.     The Debtor's Real Property and Business

A.      The Debtor is the fee owner of the following parcels of real property:

(i)     264 West 115th Street, New York, New York 10026 (Section 7, Block 1830, Lot 53) (10 Units);

(ii)    276 West 115th Street, New York, New York 10026 (Section 7, Block 1830, Lot 59) (8 Units);

(iii)   278 West 115th Street, New York, New York 10026 (Section 7, Block 1830, Lot 60) (10 units);

(iv)    2120 Frederick Douglass Boulevard, a/k/a 2120B Fredrick Douglass Boulevard, a/k/a 2120 8th Avenue, a/k/a 2120B 8th Avenue, New York, New York 10026 (Section 7, Block 1830, Lot 64) (9 Units);

(v)     2122 Frederick Douglass Boulevard, a/k/a 2122 8th Avenue, New York, New York 10026 (Section 7, Block 1830, Lot 163) (9 Units); and

(vi)    2124 Frederick Douglass Boulevard, a/k/a 2124 8th Avenue, New York, New York 10026 (Section 7, Block 1830, Lot 63) (9 Units);

(collectively, the "**Real Property**").

B.      The Real Property is currently occupied by tenants pursuant to individual leases.

**III.    The Loans Against the Real Property**

A.      On or about November 25, 2014, the Debtor, for the purpose of evidencing a loan (the "**First Loan**") in the principal amount of $5,775,000.00, duly executed, acknowledged and delivered to Signature Bank, a New York banking corporation ("**Signature**"), as obligee, an Amended, Consolidated and Restated Mortgage Note dated November 25, 2014 (the "**First Note**").

B.      For the purpose of securing payment of the indebtedness due in connection with the First Loan and the First Note, the Debtor, as mortgagor, duly acknowledged and delivered to Signature, as mortgagee, a certain Mortgage Consolidation, Modification, Security Agreement and Fixture Filing dated November 25, 2014 (the "**First Mortgage**"). Pursuant to the First Mortgage, the Debtor mortgaged to Signature the Real Property. The First Mortgage was duly recorded in the office for the recording of mortgages in New York County (the "**Register's Office**") on January 12, 2015 under CRFN 2015000013563.

C.      Daniel Reifer, as guarantor (the "**Guarantor**"), duly executed, acknowledged and delivered to Signature a certain Limited Guaranty with respect to the First Loan dated November 25, 2014 (the "**First Loan Guaranty**"). Pursuant to the First Loan Guaranty, the Guarantor irrevocably and unconditionally guaranteed to Signature, and its successors and assigns (including, without limitation, the Lender), the payment and performance of any and all Guaranteed Obligations (as that term is defined in the First Loan Guaranty) as and when the same shall be due and payable. The First Note, the First Mortgage, and the First Loan Guaranty, together with all

other documents and/or agreements that were executed and/or delivered in connection with the First Loan are collectively referred to herein as the "**First Loan Documents**").

D.      Pursuant to, among other things (i) an Allonge, dated as of December 11, 2019 (the "**First Note Allonge**"), (ii) an Assignment of Mortgage Without Covenant, dated as of December 11, 2019 (the "**First Mortgage Assignment**"), and (iii) an Omnibus Assignment, dated as of December 11, 2019 (the "**Omnibus Assignment of Loan Documents**"), the First Note, the First Mortgage, the First Loan Guaranty, and all of the other First Loan Documents were duly assigned by Signature to the Lender. The First Mortgage Assignment was sent to be recorded with the Register's Office.

E.      On or about November 4, 2016, the Debtor, for the purpose of evidencing a loan (the "**Second Loan**," and together with the First Loan, the "**Loans**") in the principal amount of $1,150,000.00, duly executed, acknowledged and delivered to Signature, as obligee, a Mortgage Note (the "**Second Note**," and together with the First Note, collectively, the "**Notes**").

F.      For the purpose of securing payment of the indebtedness due in connection with the Second Loan and the Second Note, the Debtor, as mortgagor, duly acknowledged and delivered to Signature, as mortgagee, a certain Second Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated November 4, 2016 (the "**Second Mortgage**," and together with the First Mortgage, collectively, the "**Mortgages**"). Pursuant to the Second Mortgage, the Debtor mortgaged the Real Property. The Second Mortgage was duly recorded in the Register's Office on November 14, 2016 under CRFN 2016000398372.

G.      For the purpose of further securing payment of the indebtedness due in connection with the Second Loan and the Second Note, the Guarantor duly executed, acknowledged and delivered to Signature a certain Limited Guaranty dated November 4, 2016 (the "**Second Loan**

**Guaranty**," and together with the First Loan Guaranty, collectively, the "**Guaranties**"). Pursuant to the Second Loan Guaranty, the Guarantor irrevocably and unconditionally guaranteed to Signature, and its successors and assigns (including, without limitation, the Lender), the payment and performance of any and all Guaranteed Obligations (as that term is defined in the Second Loan Guaranty) as and when the same shall be due and payable.

H.    For the purpose of further securing payment of the indebtedness due in connection with the Second Loan and the Second Note, the Borrower agreed, pursuant to that certain Violations Affidavit dated November 4, 2016 (the "**Second Loan Violations Affidavit**"), to undertake to have certain violations relating to the Real Property corrected within six (6) months of the date of said Second Loan Violations Affidavit. The Second Note, the Second Mortgage, the Second Loan Guaranty, and the Second Loan Violations Affidavit, together with all other documents and/or agreements that were executed and/or delivered in connection with the Second Loan are collectively referred to herein as the "**Second Loan Documents**," and collectively with the First Loan Documents, the "**Loan Documents**".

I.    Pursuant to, among other things (i) an Assignment of Mortgage Without Covenant, dated as of December 11, 2019 (the "**Second Mortgage Assignment**," and together with the First Mortgage Assignment, collectively, the "**Mortgage Assignments**"), and (ii) the Omnibus Assignment of Loan Documents, the Second Note, the Second Mortgage, the Second Loan Guaranty, the Second Loan Violations Affidavit and all other Second Loan Documents and all rights thereunder were duly assigned by Signature to the Lender. The Second Mortgage Assignment was sent to be recorded with the Register's Office.

J.      The Lender is the due and proper assignee of Signature with respect to all of the Loan Documents, is now the owner and holder of all of the Loan Documents, and the Lender is entitled to enforce its rights under all of the Loan Documents.

## IV.    Prepetition Litigation with the Lender

A.      On January 22, 2020, the Lender commenced an action (the "**State Court Action**") in the New York State Supreme Court in the County of New York (the "**State Court**") under Index No. 850009/2020, by filing a summons and verified complaint against, among others, the Debtor and the Guarantor seeking to, among other things, foreclose on the Real Property and recover from the Guarantor under the Guaranties any deficiency of the debt remaining unsatisfied after a sale of the Real Property. The Lender's complaint was thereafter amended pursuant to an Amended Verified Complaint in a Foreclosure Action dated and filed in the State Court on March 12, 2020 (the "**Foreclosure Complaint**").

B.      In the State Court Action, the Lender sought to foreclose and collect upon the Loans and exercise its rights under the Mortgages and Guaranties alleging numerous defaults including, but not limited to: (i) failure to pay the Loans by the December 10, 2019 maturity date (the "**Maturity Event of Default**"); (ii) failure to remove by May 4, 2017 certain violations against the Real Property as required pursuant to the Second Loan Violations Affidavit (the "**Violations Event of Default**"); and (iii) beginning January 6, 2015 and thereafter, the Debtor's and the Guarantor's concealment, removal or permitting to be concealed or removed, part of the Debtor's property, with intent to hinder, delay or defraud the Debtor's creditors, and making, or causing the Debtor to suffer, one or more fraudulent transfers under any bankruptcy, fraudulent conveyance or similar law (the "**Wrongful Transfers Event of Default**").

C.      The Debtor moved to dismiss the Foreclosure Complaint and challenged the Lender's right to default interest, particularly the Lender's contention that it was entitled to interest at the default rate of twenty-four (24%) percent per annum following the alleged Wrongful Transfers Event of Default when it had not provided notice of default prior to the Maturity Event of Default.

## V.      Alleged Wrongful Acts by the Debtor, Stanley Reifer and Daniel Reifer

A.      On July 19, 2017, Daniel Reifer, on behalf of himself, DRR Trust and Lincoln 95, commenced an action (the "**Guarantor's Misconduct Action**") in the State Court under Index No. 654909/2017 against Stanley Reifer alleging that Stanley Reifer, among other things, withdrew and misappropriated $100,000.00 from the Debtor's bank account, which left the Borrower's account with an overdraft of $74,129.63.

B.      On November 4, 2019, Stanley Reifer, on behalf of himself, the Debtor and Lincoln 95, commenced an action (the "**Stanley's Misconduct Action**") in the State Court under Index No. 656509/2019 against, Daniel Reifer, the DRR Trust and RMC Equities, LLC ("**RMC Equities**"), alleging that Daniel Reifer, among other things, misappropriated over $1 million from the Debtor and engaged in a pattern and practice of unauthorized payments to himself and entities that he controlled.

## VI.     The Debtor's and Stanley Reifer's Bankruptcy Filings

A.      On August 6, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**" or "**Bankruptcy Court**") commencing Case No. 20-11812 (MG).

B.     On August 7, 2020, Yann Geron was appointed interim trustee of the Debtor's estate and he thereafter qualified and is currently serving as permanent trustee herein.

C.     On August 7, 2020, Stanley Reifer filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court commencing Case No. 20-11820 (MEW).   Salvatore LaMonica is currently serving as permanent trustee in Stanley Reifer's bankruptcy case.

D.     As a result of the bankruptcy filings, all litigation against the Debtor, including the State Court Action, and all litigation against Stanley Reifer, including the Guarantor's Misconduct Action, have been stayed by virtue of Section 362 of the Bankruptcy Code.

## VII.   The Lender's Claims and this Stipulation

A.     On account of the Loans and Mortgages, the Lender asserts a first priority secured claim against the Real Property and its other collateral in the amount in excess of $14.2 million as of August 31, 2020 (the "**Asserted Secured Claim**").

B.     The Lender alleges that pursuant to the First Note, upon the occurrence of any default under any of the First Loan Documents, after the expiration of applicable notice and grace periods, interest on the First Loan automatically accrues at the default rate of 24% per annum (the "**Default Rate**").

C.     The Lender alleges that Borrower was not entitled to any notice or grace period with respect to the First Loan Events of Default (as defined in the Lender's Foreclosure Complaint).

D.     The Lender alleges that by reason of defaults under the First Note and the First Mortgage, Default Rate interest has accrued and continues to accrue on the First Loan at least as of May 4, 2017, and the Lender continues to assert that Default Rate interest began to accrue as of January 6, 2015.

8

E.     The Lender alleges that pursuant to the Second Note, upon the occurrence of any default under the Second Loan Documents, after the expiration of applicable notice and grace periods, interest on the Second Loan automatically accrues at the Default Rate.

F.     The Lender alleges that the Debtor was not entitled to any notice or grace period with respect to the Second Loan Events of Default (as defined in the Lender's Foreclosure Complaint). By reason of defaults under the Second Note, the Second Mortgage and the Second Loan Violations Affidavit, the Lender asserts that Default Rate interest has accrued and continues to accrue on the Second Loan at least as of May 4, 2017, and the Lender continues to assert that Default Rate interest accrued as of November 4, 2016.

G.     Both the Parties are desirous of resolving all issues between them and liquidating the Real Property expeditiously consistent with the Trustee's duties under Section 704(a)(1) of the Bankruptcy Code, and have engaged in extensive communications and discussions concerning the relative merits of the Parties' positions, and the most appropriate and fair mechanism for the Trustee's liquidation of the Real Property, resulting in the agreement set forth in this Stipulation.

**NOW THEREFORE**, the Parties hereby stipulate and agree, through their undersigned counsel, and intending to be bound, as follows:

1.     **Incorporation of Recitals**.  The foregoing recitals are hereby incorporated herein by reference hereby, are expressly acknowledged and agreed to by the Parties, and shall have the same force and effect as if in the body of this Stipulation.

2.     **Bankruptcy Court Approval**.  This Stipulation is subject to the Bankruptcy Court so-ordering this Stipulation. If this Stipulation is not "So-Ordered" by the Bankruptcy Court then this Stipulation shall be void *ab initio.*

3.    **Allowance of The Lender's Claims and Liens**.

(a)    The Trustee has reviewed and investigated the Loan Documents and the Asserted Secured claim and has determined in his business judgment that it is in the best interest of the Debtor and the Debtor's estate to enter into this Stipulation.

(b)    The Lender's claim under the Loan Documents is hereby permanently settled, fixed, liquidated and allowed in the sum of $11,000,000.00,[1] as of August 31, 2020, plus all interest at the Default Rate accruing on and after September 1, 2020, plus any and all additional amounts (collectively, the "**Claim Additions**") for fees, costs, expenses (including, without limitation, attorneys' fees and expenses), protective advances (including any "Lender Advances", as defined below) incurred or accruing on or after September 1, 2020, or chargeable after September 1, 2020 with respect thereto (such aggregate amount is hereinafter referred to as the "**Allowed Claim**"). Claim Additions, other than for protective advances and Lender Advances, will only be allowed if the Real Property is sold for greater than the principal amount of the Lender's claim of $11,000,000.00. For the avoidance of doubt, the amount of all protective advances and Lender Advances shall automatically be added to the amount of, and be part of, the Allowed Claim.

(c)    The Allowed Claim hereby forever constitutes an allowed, legal, valid, binding, enforceable and non-avoidable claim and obligation of the Debtor and the Debtor's estate, and is not subject to any offset, setoff, defense, counterclaim, recoupment, deduction, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law. Neither the Debtor, the Debtor's estate nor the Trustee possesses or will assert any claim, counterclaim, setoff or defense of any kind, nature, or description which would in any way affect

---

[1] This sum includes interest, default rate interest, attorneys' fees and expenses and protective advances only through August 31, 2020. In addition, the amount of all Lender Advances made by the Lender (together with interest thereon at the Default Rate from the date of any Lender Advance) and the amount of any Carve Out Expenses shall be automatically added to the amount of, and be part of, the Allowed Claim.

the validity, amount, enforceability, and non-avoidability of any part of the Allowed Claim. Nothing in this Stipulation shall in any way whatsoever limit or reduce any obligations of the Guarantor concerning or with respect to the Loan Documents or the Lender's Allowed Claim, including without limitation, for any interest accruing under the Loan Documents after the Petition Date. The Lender expressly reserves any and all rights to pursue any claims against any third parties, including without limitation any guarantor of the Loans. Any compromise in the amount of the Lender's claim pursuant to this Stipulation is not intended to, and shall not, inure to the benefit of any guarantor of the Loans.

(d)     As of the Petition Date, the Allowed Claim is fully secured pursuant to the Loan Documents by valid, perfected, enforceable and non-avoidable first priority security interests, mortgages and liens granted by the Debtor to the Lender upon all of the collateral and mortgaged property (including, without limitation, the Real Property) described in the Loan Documents existing as of the Petition Date and all rents, issues, profits, proceeds, and products thereof whether generated, arising or existing prior to or after the Petition Date (collectively, together with any other property of the Debtor's Estate (as used herein "**Estate**" shall include all items included under Section 541 of the Bankruptcy Code) in which a mortgage, security interest or lien was granted to the Lender (or Signature) prior to the Petition Date, being referred to herein as "**Pre-Petition Collateral**"), which liens of the Lender are senior to all other liens on the Pre-Petition Collateral. The Trustee, the Debtor, and the Estate will not assert any claim, counterclaim, setoff, or defense of any kind, nature or description which would in any way affect the validity, amount, enforceability and non-avoidability of any part of the Allowed Claim or any of the Lender's claims, liens, mortgages, or security interests in any of the Pre-Petition Collateral. The acknowledgment and agreement by the Trustee and Debtor's Estate, of the Allowed Claim and the liens, rights, priorities and protections

11

granted to or in favor of the Lender as set forth herein and in the Documents and this Stipulation shall constitute a valid proof of claim on behalf of the Lender in this case and the Court hereby orders that the Lender shall not be required to file any further proof of claim in this case. Without limiting the foregoing, (i) all proceeds of any sale of the Real Property (including, without limitation, any proceeds substitutions and replacements of the Real Property, including without limitation, from any closing of a sale of the Real Property, any contract rights with respect to any contract to sell the Real Property, and any deposits and other amounts to which the Trustee is entitled from any contract or attempt to sell the Real Property); and (ii) all rents, use and occupancy amounts and/or fees from any tenants or any other persons with respect to the Real Property (collectively, the "**Rents**"), in each case (i) and (ii) whether existing or arising before, on or after the Petition Date constitute part of the Lender's Pre-Petition Collateral and the Lender has a perfected, non-avoidable first priority security interest, mortgage and lien therein and thereon.

(e)     As adequate protection to the Lender for the liens, rights, priorities, claims and protections granted to it pursuant to the Loan Documents and this Stipulation and other than as set forth in Paragraph 8 herein, the Lender is hereby granted: (a) replacement liens on all property of the Debtor's Estate, including without limitation, the Real Property, Rents, contract rights, deposits, cash collateral, the Rent Account, all whether existing or arising before, on or after the Petition Date (collectively, the "**Replacement Liens**"), to secure the Allowed Claim and the Lender's claims hereunder, which Replacement Liens (i) shall be and shall continue to be first and senior in priority to all other interests, security interests, mortgages, liens and encumbrances of every kind, nature and description, whether created consensually, by an order of this Court or any other court, or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with Sections 363, 364, and/or any other Sections of the Bankruptcy Code or other applicable law, and (ii)

shall not at any time whatsoever be made subject or subordinate to, or made *pari passu* with, any other lien, security interest or claim against any property of the Trustee or the Debtor's Estate, whether any such liens now exist or are hereafter created, pursuant to Sections 363 or 364 of the Bankruptcy Code or otherwise; and (b) a priority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code in the amount of any decline in the value of any Pre-Petition Collateral and any Rents paid by the Trustee to any third person from and after the Petition Date (the "**Adequate Protection Administrative Claim**") having priority over all any and all other unsecured obligations, liabilities, indebtedness, and claims of any kind and nature, now in existence or hereafter incurred by the Debtor or the Trustee (or any successor trustee in this case), including, without limitation, any and all administrative expenses of the kinds specified or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, and other Sections of the Bankruptcy Code, and shall at all times be senior to the rights of the Trustee, any successor trustee, or any creditor or other party in interest in this case or any subsequent proceedings or cases under the Bankruptcy Code; provided, however, the Adequate Protection Administrative Claim shall be subject and subordinate in all respects to the Carve-Out Expenses (as defined in Paragraph 8 below), and shall not apply to the proceeds of any cause of action of the Debtor's estate under Chapter 5 of the Bankruptcy Code.

(f)      This Stipulation shall be sufficient and conclusive to effectuate the priority, perfection, and validity of the security interests and  liens granted hereby, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, possession or control with respect to the Rents and Rent Account (as defined below)  or other act to validate or perfect such security interest, mortgage, or liens including, without limitation, any control agreements with any financial institutions, banks or securities intermediary

13

holding any depository, brokerage, or securities account consisting of any collateral of the Lender.

4.    **Management and Sale of the Real Property Generally**.  The Trustee will proceed expeditiously with the marketing and sale of the Real Property (the "**Sale**") pursuant to Section 363 of the Bankruptcy Code in the manner that the Trustee and the Lender agree will maximize the value of the Real Property and liquidate the Real Property as quickly as possible.  The marketing plan, the method and terms of sale, and the mechanics of the auction will be subject to the Lender's consent and this Court's approval.  The Trustee will seek the Court's approval of his management of the Real Property pending the Sale pursuant to Section 721 of the Bankruptcy Code.  The Trustee will seek the Court's approval of the proposed auction and sale mechanics and procedures.

5.    **Retention of Brokers**.  Subject to the Court's approval, the Trustee will retain Maltz Auctions Inc. and Cushman & Wakefield (collectively the "**Brokers**") to market and sell the Real Property as co-brokers.  The Brokers will be entitled to compensation and reimbursement of expenses, of no greater than (i) a buyer's premium of four (4%) percent of the amount of the successful bid at an auction of the Real Property, if the Real Property is sold to a person that is not the Lender (or any designee or assignee thereof), or (ii) a commission of one (1%) of the amount of the successful bid at an auction of the Real Property solely if the Lender who is the party to this Stipulation (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) acquires the Real Property by a Lender Bid (as defined below).  The terms of sale for any Sale shall provide, among other things, that bidders other than the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) shall pay a buyer's premium of four (4%) percent of the sale price.

6.    **Retention of Property Manager**.  Subject to the Court's approval, the Trustee will retain Commercial Realty Resolutions (the "**Manager**") to manage the Real Property and collect Rents until consummation of the Sale.  In his application to the Court to retain the Manager, the Trustee will seek to have the Manager paid its pre-approved compensation and management fees (the "**Management Fee**") from the Rents actually collected by the Manager, without the need for additional orders of the Court.

7.    **Management of the Real Property**.

(a)    <u>Operation of the Real Property</u>.  The Manager will operate the Real Property as the Trustee's agent until consummation of the Sale or the Trustee's abandonment of the Real Property pursuant to Section 554(a) if the Trustee in his sole discretion after a sound exercise of his reasonable business judgment determines that the Real Property cannot or should not be sold by the Trustee.

(b)    <u>Operating Budget</u>. Following retention of and in consultation with the Manager, the Trustee will create and propose to the Lender a budget (the "**Budget**") to operate the Real Property.  A budget that has been approved in writing by the Lender is referred to herein as an "**Approved Budget**". Any non-emergency operating expenses of more than $5,000 shall require prior written approval by the Lender prior to incurrence and payment by the Manager.  Any disagreement regarding the Budget or payment of any operating expenses contemplated in the Budget, will be submitted to the Court for resolution.  Notwithstanding the foregoing, the Lender cannot be compelled to make a Lender Advance (as defined below) as part of a Budget or otherwise without the Lender's express consent.

(c)    <u>Rental Income</u>. All Rents collected by the Manager will be remitted by the Manager to the Trustee and held in a segregated bank account of the Trustee (the "**Rent Account**").

15

All Rents and funds in the Rent Account shall constitute "cash collateral" (as defined in Section 363(a) of the Bankruptcy Code), and part of Lender's Pre-Petition Collateral and the Lender shall also have a Replacement Lien thereon. For the avoidance of doubt, the Trustee hereby grants the Lender a first priority lien on all Rents arising after the Petition Date and all proceeds thereof (including without limitation all funds) in the Rent Account and the Lender hereby has a perfected and unavoidable lien and security interest in all cash collateral and the Rent Account, which liens secure the Lender's Allowed Claim. The Trustee shall not deposit any monies other than Rents into the Rent Account. The Trustee is authorized to pay expenses related to the Real Property directly from the Rents deposited in the Rent Account, provided that such expenses are set forth in an Approved Budget or are otherwise expressly approved by the Lender.

(d)    _Protective Advances_. In the event the Rents are insufficient to pay an expense from an Approved Budget or any other expense that the Trustee requests to pay in order to sell or preserve the value of the Real Property, then in the Lender's sole and absolute discretion the Lender may pay such item directly (or may advance the Trustee the funds to pay such item) any such expenses paid or advanced by the Lender shall be deemed to be a necessary protective advance pursuant to the Loan Documents (each a "**Lender Advance**"). Pursuant to and in accordance with the Loan Documents, any and all Lender Advances shall accrue interest at the Default Rate (but only to the extent that the Real Property is sold for more than $11,000,000), and shall be automatically part of, and increase the amount of, the Lender's Allowed Claim.

8.    **Carve-Out of Liens**. The Lender's liens, claims and security interests in the Real Property shall be subject only to the right of payment of the following expenses ("**Carve Out Expenses**"):

(a)    Subject to the terms and conditions of this Stipulation, in the event of the

closing of a sale of the Real Property, which sale is conducted in accordance with terms and conditions of this Stipulation, subject to the Lender's rights to oppose the Trustee's Motion for Approval of the Sale to the Successful Bidder after Auction, the commissions (but not expenses) of any retained Brokers but only to the extent: (i) the Lender has agreed in writing to the retention of such particular broker(s) and the terms and commissions thereof; (ii) in the event that the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) is not the successful bidder at an auction of the Real Property and such successful bidder takes title to the Real Property, such commissions do not exceed the aggregate sum of four percent (4.0%) of the amount bid by such successful bidder, but only to the extent that such commission is actually paid by such successful bidder in the form of a buyer's premium; and (iii) in the event that the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) is the successful bidder at an auction of the Real Property and takes title to the Real Property, such commissions do not exceed the aggregate sum of one percent (1.0%) of the amount bid by the Lender (or any designee or assignee thereof, provided such designee or assignee is affiliated with the Lender, and is not an unrelated third party) (the applicable amount set forth in this Paragraph 8(a) is referred to herein as the "**Brokers Carve Out**");

(b)    Subject to the terms and conditions of this Order, the unpaid and outstanding: (i) reasonable commissions, fees and expenses of the Trustee approved by a final order of the Court pursuant to Section 326 of the Bankruptcy Code ("**Allowed Trustee Fees**"); and (ii) the reasonable fees and expenses actually incurred and approved by a final order of the Court pursuant to Sections 327, 328, 330, or 331 of the Bankruptcy Code (collectively, "**Allowed Professional Fees**") by the attorneys and accountants retained under Section 327 of the

Bankruptcy Code by the Trustee (collectively, the "**Professionals**"), in a cumulative, aggregate sum for both the Trustee and all Professionals not to exceed $350,000 ("**Professional Fee Carve Out**") but excluding any amounts payable to the Manager or the Brokers, which shall be subject to Paragraphs 6 and 8(a) above, respectively.

(c)     The sum of $100,000 to be used by the Trustee to pay unsecured claims of the Estate (the "**Estate Pot**").

9.     Notwithstanding anything to the contrary in this Stipulation, the Professional Fee Carve Out shall not be used to pay any Allowed Professional Fees incurred in connection with any of the following: (a) a request to use any cash collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of the Lender, (b) a request for authorization to obtain post-petition loans or other financial accommodations pursuant to Sections 364(c) or (d) of the Bankruptcy Code or otherwise other than from the Lender unless such other financial accommodations repay to the Lender the Lender's Allowed Claim and all other amounts owed to the Lender, indefeasibly and in full, simultaneously within the closing of any such other financial accommodations, (c) the commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against the Lender or any of its respective officers, directors, members, employees, agents, attorneys, affiliates, assigns, or successors, including, without limitation, any attempt to recover or avoid any claim or interest from the Lender under Chapter 5 of the Bankruptcy Code, or (d) any act which has or could have the effect of materially and adversely modifying or compromising any of the rights and remedies of the Lender, or which is contrary, in a manner that is material and adverse to the Lender to any term or condition set forth in or acknowledged by this Stipulation or any of the Loan Documents.

10.     At the Lender's sole and absolute discretion, the Lender may fund at any time and in any increment in the Lender's sole and absolute discretion an amount equal to the Carve-Out Expenses by, among other things, making one or more Lender Advances (the amount of which shall be automatically added to the amount of the Lender's Allowed Claim owed by the Debtor and obligors under the Loan Documents) in order to pay any Professional in respect of the Professional Fee Carve-Out or any other party entitled to receive payment in respect of a Carve Out Expense.

11.     Any payment or reimbursement made either directly by or on behalf of the Lender at any time or by or on behalf of the Trustee in respect of any Allowed Professional Fees, Allowed Trustee Fees, or any fees and expenses of the Trustee or any of the Trustee's Professionals prior to the approval thereof by this Court shall, in either case, permanently reduce the amount of the Professional Fee Carve Out on a dollar-for-dollar basis. The Lender's obligation to fund or otherwise pay the Professional Fee Carve Out and the other Carve Out Expenses is hereby added to and made a part of the amount the Lender's Allowed Claim, secured by the Pre-Petition Collateral, and the Lender is hereby entitled to all of the rights, claims, liens, priorities and protections under this Stipulation, the Loan Documents, the Bankruptcy Code, and/or applicable law. Payment of any Carve Out Expenses, whether by or on behalf of the Lender (or by or on behalf of the Trustee), shall not, and shall not be deemed to, reduce the amount of the Lender's Allowed Claim and shall not, and shall not be deemed to, subordinate (i) any of the Lender's liens and security interests in the Pre-Petition Collateral or other collateral granted hereby or (ii) the Lender's Adequate Protection Administrative Claim to any junior pre-petition or post-petition lien, interest, or claim in favor of any other party. Except as otherwise provided herein with respect to the Professional Fee Carve Out and the other Carve Out Expenses, the Lender shall not be

responsible for the direct or indirect payment or reimbursement of any fees or disbursements of the Trustee or any Professionals incurred in connection with this case (or any subsequent case under any chapter of the Bankruptcy Code), and nothing in this Stipulation shall be construed to obligate the Lender in any way, to pay compensation to or to reimburse expenses of the Trustee or any Professional, or to ensure that the Trustee or the Estate has sufficient funds to pay such compensation or reimbursement.

12.    Each of the Parties reserves the right to object to the allowance of any fees, expense or commissions sought to be paid to the Trustee or any Professionals, all of which are subject to allowance by the Bankruptcy Court.

13.    In the event that the actual amount of fees, commissions and expenses attributable to the Sale or other activities which are allowed by the Court are less than the sum of the Brokers Carve Out and the Professionals Fee Carve Out, the balance of such Carve Out Expenses not allowed by the Court shall be added to the Estate Pot.

14.    **Purchaser Responsibilities**.  Unless otherwise agreed by the Lender, the terms of sale proposed by the Trustee with respect to any Sale of the Real Property shall require that the purchaser(s) of the Real Property will be responsible for the payment of: (i) any buyer's premium to the Broker (provided that neither the Lender nor any designee or assignee thereof, as long as such designee or assignee is affiliated with the Lender, and is not an unrelated third party); (ii) any real property taxes and transfer taxes; and (iii) any amounts due on account of fines and violations.

15.    **Lender's Right to Credit Bid**.

(a)    Notwithstanding anything to the contrary whatsoever, the Lender (or its designee or assignee) may, at any Sale of all or any part of the Real Property, credit bid (a "**Lender Credit Bid**") all or any part of its Allowed Claim, up to the full amount of the Allowed Claim plus

all Lender Advances plus all other Claim Additions (permitted pursuant to Paragraph 3(b)), pursuant to any terms of sale. Furthermore, notwithstanding anything to the contrary, the Lender (or its designee or assignee) shall not be required to deliver any deposit to the Trustee or to pay any buyer's premium at any time.  In the event any Lender Credit Bid is deemed the highest and best offer and the Sale is made to the Lender (or its designee or assignee), then any commissions due the Brokers will be paid by the Trustee from the Lender Bid Cash Component (as defined below).

(b)      If and only if (i) the Lender (or its designee or assignee) is the successful bidder at a Sale of the Real Property on account of a Lender Credit Bid and (ii) the bid actually submitted by the Lender (or its designee or assignee ) (such actual bid being the "**Lender Bid**") did not include at least $5,000,000 in cash in excess of the Lender Credit Bid, then notwithstanding that the Lender (or its designee or assignee) submitted a Lender Credit Bid, at the actual closing of the Sale of the Real Property, the Lender Bid shall be deemed modified to be as follows:

i.      The Lender Bid shall be (i) $5,000,000 in cash (the "**Lender Bid Cash Component**"), **PLUS** (ii) a credit bid in an amount equal to: (x) the amount of the Lender Bid, <u>less</u> (y) the amount of the Lender Bid Cash Component (such modified credit bid amount being the "**Resulting Credit Bid**").

16.      **Payment of The Lender's Allowed Claim and Lender's Deficiency Claim**.

(a)      No later than one (1) business day following the Trustee's receipt of any proceeds of sale of the Real Property whether from a third-party bidder or from the Lender Bid Cash Component (collectively, the "**Sale Proceeds**"), the Trustee shall initiate a wire transfer to the Lender (pursuant to such wire instructions as the Lender shall provide to the Trustee) in an

amount equal to the gross amount of all the Sale Proceeds, plus all Rents collected and then held by the Trustee or the Manager with respect to the Real Property subject to the Sale, less (i) the amount of a 1% Brokers' commission (but only if the Lender or its designee or assignee, provided such designee or assignee is affiliated with the Lender, and is not a related third party, is the successful bidder at the Sale) or a 4% Brokers' commission (but only if the entity submitting the credit bid is an assignee of the Lender that is not affiliated with the Lender), (ii) any then unpaid Management Fee owed as of the date of the closing of the Sale, and (iii) the sum of $450,000 (such amount to be paid to the Lender being referred to herein as the "**Lender Payment**").[2]

(b)    In the event that the Sale Proceeds from all Sales of Real Property are not sufficient to pay the Lender's Allowed Claim in full, then the Lender shall automatically have a deficiency claim (the "**Deficiency Claim**") under the Loan Documents in the amount equal to the sum of:

(i) the amount of the Lender's Allowed Claim on the date of the Lender's receipt of the Lender Payment; **PLUS**

(ii) any Claim Additions; **PLUS**

(iii) any amount of Sale Proceeds required to be paid to NYC under Paragraph 22 below; **PLUS**

(iv) the amount of the Lender Bid Cash Component, if the Lender (or its assignee or designee) is the purchaser of the Real Property and such amount was paid to the Trustee; **LESS**

---

[2] The Trustee has explained to the Lender the United States Trustee's general limitations on the use of wire transfers pursuant to Section 5(F)(2) of the United States Trustee's Handbook for Chapter 7 Trustee, effective October 1, 2012, and requested to make this payment by estate check. The Lender insisted that the payment be made by wire and that it was a material condition to entry into this Stipulation.

(v) the amount of the Lender Payment; **LESS** (but, if and only if the Lender or its assignee or designee is the purchaser of the Real Property and made a Lender Credit Bid)

(vi)(A) if the Lender Bid Cash Component was paid to the Trustee, the amount of the Resulting Credit Bid, or (B) if no Lender Bid Cash Component was paid to the Trustee, the amount of the actual Lender Credit Bid.

The Deficiency Claim shall be an allowed claim.

17.    The Lender shall not be entitled to share in the Estate Pot on account of its Deficiency Claim unless and until all other pre-petition claims are paid in full. For the avoidance of doubt, the Lender shall be entitled to share in all other assets of the Estate and receive distributions on account of its Deficiency Claim.

18.    **Sharing of Proceeds of Claims Against Daniel Reifer**.  (a) Stanley Reifer has identified a number of potential avoidance and other claims against Daniel Reifer.  To the extent that the Trustee pursues those claims, or any other claims owned by the Debtor or the Estate against Daniel Reifer, the DRR Trust, RMC Equities and/or any other affiliate, relative, successor, transferee or assignee of any of the foregoing (all of the foregoing being collectively the "**Daniel Reifer Related Persons**") then the Lender shall be entitled to eighty (80%) percent of the net proceeds of the recovery on those claims after payment of all reasonable and allowed professional fees and expenses of the Trustee and Trustee commissions, in each case directly associated with the recovery on those claims against the Daniel Reifer Related Persons, up to the amount of the Deficiency Claim.  The Trustee shall seek authority to make such payment to the Lender promptly after the Trustee's receipt of any recovery from any of the Daniel Reifer Related Persons.  The

Trustee shall be free to abandon or settle any of the estate's claims against the Daniel Reifer Related Persons without the consent of the Lender.

(b)     To the extent that the Lender pursues its Deficiency Claim against Daniel Reifer or any of the other Daniel Reifer Related Persons, then the Trustee shall be entitled to fifteen (15%) percent of the net proceeds of the recovery on those claims after payment of all fees and expenses, including, without limitation, all attorneys' fees and expenses, of the Lender associated with the prosecution and/or recovery on such claims against Daniel Reifer or the other Daniel Reifer Related Persons. The Lender shall make such payment to the Trustee after such recovery has become indefeasible. The Lender shall be free to abandon or settle the Deficiency Claim without the consent of the Trustee.

19.     **Trustee's and Trustee's Professionals Administrative Costs and Compensation**.  Except for the Carve Out Expenses, no costs or expenses of administration which have been or may be incurred in this case at any time shall be charged against the Lender or any of the Lender's collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the Lender.

20.     **Modification of the Automatic Stay**. The automatic stay imposed under Section 362(a) of the Bankruptcy Code shall be, and hereby is, vacated with respect to the continuation of the State Court Action, provided, however, that the Lender will not seek any relief against the Debtor in connection with the State Court Action that is inconsistent with this Stipulation, and the automatic stay shall not be vacated with respect to any other parties' claims against the Debtor in the State Court Action, if any.

21.     **Prosecution of the State Court Action**.  The Lender may prosecute the State Court Action, including claims against Daniel Reifer or any Daniel Reifer Related Persons without

interference by the Trustee.  Specifically, the Trustee does not object to the Lender's removal of the State Court Action to this Court.

22.     **New York City.**

(a)      Notwithstanding any other provision in this Stipulation and for avoidance of doubt, the Lender's Allowed Claim (including any Lender Advances and Claim Additions) shall not, at any time, prime any statutory liens of the City of New York ("NYC") that may attach to the Lender's pre-Petition or post-Petition collateral, including any Replacement Liens that may be granted to the Lender pursuant to the Stipulation, for unpaid real estate taxes, water and sewer charges, emergency repair liens or other liens of the same priority under the New York City Administrative Code, in all such cases solely to the extent that the NYC liens are senior to the Lender's liens under applicable state law.

(b)      If the Real Property is sold under Section 363(b) of the Bankruptcy Code: (i) any ECB liens of NYC shall attach to the Sale Proceeds in the order of their priority; provided however, for the avoidance of doubt, the NYC ECB liens are junior in priority to the Lender's liens and the ECB liens shall be paid from the Sale Proceeds available after payment in full of the Lender's Allowed Claim (including any Lender Advances and Claim Additions); and (ii) the Trustee shall pay to NYC from the Sale Proceeds up to $26,000 to satisfy any then open DOB violations.

23.     **Binding Terms**. The terms of this Stipulation shall be binding upon all parties in interest. The Lender's Allowed  Claim shall constitute: (i) an allowed claim, not subject to subordination and otherwise unavoidable, for all purposes in this case, other than as specifically set forth herein, (ii) the prepetition liens of the Lender on or related to the Lender Collateral, which shall be deemed legal, valid, binding, perfected, not subject to defense, claim, counterclaim, re-

characterization, offset of any kind, subordination, and otherwise unavoidable, and (iii) associated

prepetition liens, which shall not be subject to any other or further challenge by any party in interest

seeking to exercise the rights of the Debtor's Estate against the Lender all of which have been

forever waived and released.

24.    **Amendment and Waivers**.  This Stipulation may not be modified, amended,

waived, changed or terminated orally, but only by an agreement in writing, signed by all Parties

and approved by order of the Court.

25.    **Complete Agreement**.  This Stipulation constitutes the entire agreement and

understanding between and among the Parties relating to the subject matter hereof, and supersedes

all prior proposals, negotiations, agreements and understandings (written or oral), among the

parties hereto with respect to such subject matter.

26.    **Binding Effect**.    Upon Bankruptcy Court approval of this Stipulation, this

Stipulation will be binding upon the Trustee, the Debtor's Estate and the Lender, and their

successors and assigns. The provisions of this Stipulation, and any and all rights, remedies,

privileges, and benefits in favor of the Lender provided or acknowledged in this Stipulation, and

any actions taken pursuant thereto, shall be effective immediately upon this Stipulation being "So-

Ordered" or the entry of an order by the Bankruptcy Court approving this Stipulation pursuant to

Bankruptcy Rules 6004 and 7062 (and any stay is hereby dispensed with), shall continue in full

force and effect, and shall survive entry of any such other order, including, without limitation, any

Order which may be entered by this Court, including any Order dismissing this case or abandoning

the Real Property.  Any Order dismissing this case under Section 707(a) of the Bankruptcy Case

or otherwise, or permitting the abandonment of the Real Property shall be deemed to provide (in

accordance with Sections 105 and 349 of the Bankruptcy Code) that: (a) the Lender's liens in all

of its collateral shall continue in full force and effect notwithstanding such dismissal or abandonment until all obligations have been paid to the Lender in full; and (b) this Court shall retain jurisdiction, notwithstanding such dismissal or abandonment, for the purposes of enforcing the claims of the Lender and its liens in any collateral.

27.    **Choice of Law and Jurisdiction**.  This Stipulation shall be construed, and the rights and liabilities of the Parties hereto shall be determined, in accordance with the laws of the State of New York and applicable Federal law.  The Parties hereby consent to the resolution of any and all disputes arising under, in connection with or relating to this Stipulation, and any claims or actions based upon this Stipulation, by and under the exclusive jurisdiction of the Court.

28.    **Further Assurances**.  Each Party agrees at any time and from time to time at each such Party's own expense, upon request of a Party hereto, as applicable, to promptly execute, deliver, or obtain or cause to be executed, delivered or obtained any and all further instruments and documents and to take or cause to be taken all such other action such Party, as applicable, may deem reasonably desirable in obtaining the full benefits of this Stipulation.

29.    **Headings: Interpretation**. Section and subsection headings are for convenience of reference only, are not part of this Stipulation and shall not affect the construction of, or be taken into consideration in interpreting, this Stipulation. For purposes of this Stipulation: (i) the term "including" shall be deemed to mean "including, without limitation,"; (ii) the term "person" means any natural person or any entity, including any corporation, partnership, joint venture, trust, limited liability company, unincorporated organization or association, or trustee; and (iii) whenever the context of this Stipulation reasonably requires, all words used in the singular shall be deemed to have been used in the plural, and the neuter gender shall be deemed to include the masculine and feminine gender, and vice versa. This Stipulation has been prepared and drafted through a joint

effort of the Parties hereto and, therefore it shall not be construed against any of the Parties as the person who prepared or drafted this Stipulation.

30.    **Execution in Counterparts**.  This Stipulation may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.   This Stipulation may be executed by electronic signatures, including without limitation, by PDF, and all electronic signatures shall have the same force and effect as an original signature.

31.    **Expenses**.  Each Party shall pay its own fees, costs, expenses and disbursements in connection with the preparation, execution and delivery of this Stipulation and each of the other documents executed in connection herewith and the transactions contemplated hereby.

32.    **Successors and Assigns**. This Stipulation shall be binding on and inure to the benefit of the successors and assigns of each of the Parties.

Dated:   New York, New York
         December 1, 2020                      **YANN GERON, CHAPTER 7 TRUSTEE**


                                  By:   _/s/ Yann Geron_
                                        Yann Geron, not individually but solely in
                                        his capacity as Chapter 7 Trustee of the
                                        Estate of Eight-115 Associates, LLC

28

Dated:   New York, New York
         December 1, 2020

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By:    /s/ Fred Stevens
       Fred Stevens
       Kathleen Aiello
       200 West 41st Street, 17th Floor
       New York, New York 10036-7203
       Tel: (212) 679-5320
       Email: fstevens@klestadt.com
              kaiello@klestadt.com

*Counsel to Yann Geron, Chapter 7 Trustee*

Dated:   New York, New York
         December 1, 2020

**HARLEM MULTIFAMILY LLC**

By:    /s/ Jason Leibowitz
       Jason Leibowitz
       100 Park Avenue, Suite 2805
       New York, New York 10017

Dated:   New York, New York
         December 1, 2020

**KATSKY KORINS LLP**

By:    /s/ Steven H. Newman
       Steven H. Newman
       Robert A. Abrams
       605 Third Avenue
       New York, New York 10158-0038
       Tel: (212) 716-3235
       Email: snewman@katskykorins.com
              rabrams@katskykorins.com

*Counsel to Harlem Multifamily LLC*

**"SO-ORDERED"**

January 20, 2021


_____/s/Martin Glenn_____
United States Bankruptcy Judge